# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JAMES YORK, *et al.*,<br><br>    Defendants. | 1:16-cr-00069-LJO-SKO<br><br>**MEMORANDUM DECISION AND ORDER DENYING DEFENDANT MONSON'S MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION TO SUPPRESS WIRETAPS**<br><br>(ECF Nos. 458, 461, 462, 463, 464, 466, 467, 468, 469, 470, 471, 477, 478, 479, 480, 484) |

On September 29, 2017, the Court denied Defendants' motions to suppress the results of the wiretap interceptions in this case, and denied Defendants' motions for a *Franks* hearing. (ECF No. 456.) On October 11, 2017, Defendant Trenell Monson filed a motion for reconsideration of that order based on newly discovered evidence. (ECF No. 458.) Numerous co-defendants joined the motion.[1] (ECF Nos. 461, 462, 463, 464, 466, 467, 468, 469, 471, 477, 478, 479, 480, 484.) The Government filed an opposition. (ECF No. 481.) Defendant Canady filed a reply, which was joined by several defendants. (ECF Nos. 483, 486, 487.)

The affidavit filed in support of the first wiretap order in this case averred that during the course of a November 3, 2015 traffic stop, Defendant Monson stated to Fresno Police Officer Price that he

---

[1] The following defendants moved to join the motion: Markeith Canady, James York, Steven Blackmon, Darrell Maxey, Kenneth Johnson, Davon Millro, Kiandre Johnson, Luther Newsome, Anthony Windfield, William Lee, Marvin Larry, Kenneth Wharry, Deandre Stanfield, Aquilla Bailey, and Sharika Gaines.

1

wanted to "pimp out" Detective Cerda, a female officer who was present at the scene. (Wiretap Affidavit No. 16-001 at 86-87, ECF No. 313-1.) Defendant Monson requested that the Government provide any body camera footage of the traffic stop, but was informed by the Government that there was no such footage, and indeed that FPD's body camera program was not yet in place at the time of the incident. (Declaration of Eric Fogderude, ECF No. 459-1, ("Fogderude Decl.") Exs. A-E.) After briefing was complete on Defendants' initial motion to suppress the wiretaps, the Government turned over body camera footage of the stop. (Fogderude Decl. Ex. A.) The transcript of the footage does not contain any statement by Defendant Monson about Detective Cerda. (Fogderude Decl. Ex. F.) Defendant Monson argues that the newly discovered body camera footage contradicts the wiretap affidavit's account of the traffic stop, and therefore that the affidavit did not contain probable cause as to Monson. (ECF No. 460.)

The Government's opposition and accompanying declarations argue that the statement allegedly missing from the body camera footage was not made until after the body camera was turned off. (ECF No. 481, 481-1 (Declaration of Sergeant Andre Benson ("Benson Decl.")), 481-2 (Declaration of Sergeant Zebulon Price ("Price Decl.")), 481-3 (Declaration of Officer William Richards ("Richards Decl.")).) Officer Price avers that after officers made the initial stop and secured the scene, the body camera was switched off. (Price Decl. ¶¶ 3-4.) Detective Cerda, about whom the comment was made, did not arrive on the scene until later. (*Id.* ¶ 4.) In other words, there is no contradiction.

The body camera footage does not add anything to what was previously known or understood about the traffic stop, and therefore does not alter the Court's reasoning in the initial order. The body camera footage is consistent with the affiant's description of the traffic stop, insofar as it indicates that Monson was found in possession of cash and the identification cards of suspected prostitutes. (Fogderude Decl. Ex. F.) Although the footage does not contain any statement by Monson about "pimping out" Detective Cerda, the Court notes Officer Price's explanation that the statement was made

after the camera was turned off.[2] (Price Decl. ¶ 4.) Nothing in the transcript indicates that Detective Cerda arrived on the scene during the course of the recording. The fact that the body camera footage does not contain the statement allegedly made after it was turned off does not suggest that the footage in any way contradicts the affiant's account.[3]

The footage does not undermine the probable cause to intercept Monson's communications. Likewise, a *Franks* hearing is not warranted, since the newly discovered footage is not material to the probable cause determination.

It is noted that Defendant Monson requests sanctions in the form of precluding evidence. The body camera recording was not material to prove or disprove that which was already known. Since there was no prejudice in the late production of the tape, the request for sanctions is denied.

In his joinder and reply, Canady rehashes a different issue, arguing that "[t]he government has never addressed [the] fact that Sgt. Benson was told that DPG members would not use their cell phones to discuss 'work' and concealed that vital information from the magistrate who reviewed his application

---

[2] Defendant Monson suggests that the video may have been altered or edited to remove part of the conversation. Monson stated in an earlier declaration that during the November 2015 traffic stop, a male officer asked him whether he would like to pimp out the female officer. (ECF No. 440 ¶¶ 7-8.) He stated that he assumed that the comment was an attempt to bait him, and did not respond affirmatively. (*Id.*) No version of this conversation – neither the affiant's account, nor Monson's – appears on the recording. Price's declaration indicates that the recording terminated prior to this conversation. (Price Decl. ¶¶ 3-4.) Officer Richards avers that the footage is uneditable by any user in the system. (Richards Decl. ¶ 3.) There is no creditable evidence to suggest that the recording was altered in any way. Defendant's request for supplemental discovery as to the body camera footage for the November 3, 2015 traffic stop is therefore denied.

[3] There was still sufficient probable cause to intercept Monson's communications even excluding his alleged statement about "pimping out" a female officer. In its initial order, the Court noted that Monson the Court still would have original order that the "state court's probable cause finding [as to Monson] was neither clearly erroneous *nor close to it*." (ECF No. 456 at 15.) As the Court noted:

> Monson is a validated member of the DPG . . . . Monson also had a prior conviction for pimping for prostitution a minor over 16 years of age. (16-001:17.) The Affidavit also described a recent incident in which Monson was stopped in his vehicle while transporting a suspected prostitute. (16-001:86-87.) Monson was found in possession of $2,800 cash, and several identification cards and debit cards of women believed to be prostitutes working for Monson. (*Id.*) Further investigation revealed that at least two of those prostitutes had tattoos identifying them as prostitutes working for Monson. (*Id.*) . . . The Affidavit also describes a video in which Monson identifies himself to another DPG member as a pimp. (16-001:87-88.)

(ECF No. 456 at 14-15.) The other evidence in the affidavit was sufficient to establish probable cause that Monson was involved in pimping and human trafficking.

for probable cause to believe that conversations would be heard on the phone, as well as for 'necessity.'" (ECF No. 483 at 1-2.) The Court addressed a version of this argument its initial order, noting that "[l]aw enforcement credibly could believe both that the Target Subjects would be reluctant or cautious in using their cellular phones to discuss criminal activity, yet simultaneously and reasonably believe they would eventually discuss information that would advance the goals of the investigation." (ECF No. 456 at 28 (citing *United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995) ("the fact that [defendants] might have suspected the phone was tapped does not mean the wiretap was certain to fail. Suspicion is not the same as certainty; individuals who merely suspect they are under surveillance may get careless and utter incriminating statements")).) The fact that Sergeant Benson had been told by an informant that Dog Pound Gang members would not use their cell phones to discuss criminal activity is not inconsistent with his statement that he believed, based on his experience with and observation of DPG members, that they would use their cell phones to discuss criminal activity. In *Meling*, the Court noted that defendants did engage in conversations "relevant to the investigation" even though they suspected that their phones were tapped. 47 F.3d at 1552. Defendants in this case also allegedly made relevant statements on the phone in spite of their concern about surveillance. Defendants did not meet their burden of showing that the affiant made a material misrepresentation to the issuing court about the likelihood that criminal activity would be discussed over the targets' cell phones.

**CONCLUSION AND ORDER**

For the foregoing reasons, Defendant Monson's motion for reconsideration of the order denying his motion to suppress the wiretaps and for sanctions is DENIED. (ECF No. 358.) Accordingly Defendants' motions for joinder are likewise DENIED. (ECF Nos. 461, 462, 463, 464, 466, 467, 468, 469, 470, 471, 477, 478, 479, 480, 484.)

IT IS SO ORDERED.

Dated: **November 1, 2017**          /s/ Lawrence J. O'Neill
                                                     UNITED STATES CHIEF DISTRICT JUDGE